IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-344-D

| | |
|---|---|
| BOBBYDYNE MCMILLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| CUMBERLAND COUNTY SCHOOLS, | ) |
| CUMBERLAND COUNTY BOARD | ) |
| OF EDUCATION, and | ) |
| JOSEPH M. LOCKLEAR, | ) |
| | ) |
| Defendants. | ) |

On May 27, 2014, Bobbydyne McMillan ("McMillan" or "plaintiff") filed suit against

Cumberland County Schools in Cumberland County Superior Court, asserting various claims arising

from her termination as a school employee. See [D.E. 1-1] 9–21. On June 13, 2014, Cumberland

County Schools removed the action to this court [D.E. 1]. On June 20, 2014, Cumberland County

Schools moved to dismiss McMillan's complaint [D.E. 5]. On July 11, 2014, McMillan amended

her complaint, dropping Cumberland County Schools as a defendant and adding as defendants the

Cumberland County Board of Education ("CCBE") and Joseph M. Locklear ("Locklear")

(collectively, "defendants") [D.E. 8].[1] On September 26, 2014, the court issued a scheduling order,

setting January 16, 2015, as the deadline for amending pleadings [D.E. 21].

On November 4, 2014, McMillan moved for leave to file a second amended complaint [D.E.

24]. On December 30, 2014, the court granted McMillan leave to file a second amended complaint

---

[1] Locklear died while the action was pending. To the extent Locklear is sued in his official
capacity, his successor in interest, Reuben A. Reyes, is automatically substituted as a defendant. See
Fed. R. Civ. P. 25(d). To the extent that Locklear is sued in his individual capacity, the court's
reference to "Locklear" includes the representative of Locklear's estate. See id. 25(a).

[D.E. 28]. On January 9, 2015, McMillan filed a second amended complaint [D.E. 29]. In the complaint, McMillan claims: (1) that defendants deprived her of a property interest in her continued employment without due process; (2) that Locklear tortiously interfered with her employment contact with the CCBE; (3) that Locklear fraudulently induced her to resign; and (4) that defendants negligently induced her to resign. 2d Am. Compl. [D.E. 29] ¶¶ 37–76.

On December 15, 2015, McMillan filed a motion for leave to file a third amended complaint [D.E. 42] and a memorandum in support [D.E. 43]. On December 31, 2015, defendants filed a motion for summary judgment [D.E. 45], a statement of material facts [D.E. 46], and a memorandum in support [D.E. 47]. On January 5, 2016, defendants filed a memorandum in opposition to McMillan's motion for leave to file a third amended complaint [D.E. 49]. On January 19, 2016, McMillan replied to defendants' memorandum in opposition to McMillan's motion for leave to file a third amended complaint [D.E. 50]. On January 21, 2016, McMillan responded in opposition to defendants' motion for summary judgment [D.E. 51] and to defendants' statement of material facts [D.E. 52]. On February 4, 2016, defendants replied to McMillan's response in opposition to defendants' motion for summary judgment [D.E. 55], which defendants amended on February 5, 2016 [D.E. 56]. On February 10, 2016, McMillan filed a surreply in opposition to defendants' motion for summary judgment [D.E. 57], which she amended on February 11, 2016 [D.E. 58]. As explained below, the court denies McMillan's motion to file a third amended complaint and grants defendants' motion for summary judgment.

I.

The Cumberland County Board of Education ("CCBE") employed McMillan from August 1994 through May 2012. See 2d Am. Compl. ¶ 7; Ans. [D.E. 39] ¶ 7; Defs.' Stmt. Material Facts [D.E. 46] ¶¶ 1–3; Pl.'s Resp. Defs.' Stmt. Material Facts [D.E. 52] ¶¶ 1–3. The CCBE oversees

2

public schools in Cumberland County, North Carolina and is sometimes called "the Cumberland County Schools." 2d Am. Compl. ¶ 2; Ans. ¶ 2. At all times relevant to this case, Locklear served as Cumberland County's Associate Superintendent for Human Resources and was "in charge of all personnel issues." See Till Dep. [D.E. 46-3] 12–13; 2d Am. Compl. ¶ 3; Ans. ¶ 3.

## A.

In August 1998, McMillan obtained "career status," commonly known as tenure. Defs.' Stmt. Material Facts ¶ 2; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 2. A county board of education may dismiss an employee with career status only in accordance with certain procedures. See N.C. Gen. Stat. § 115C-325(h). The provisions of N.C. Gen. Stat. § 115C-325 were "expressly incorporated into [McMillan's] employment contract." Defs.' Stmt. Material Facts ¶ 40; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 40. An employee with career status may be fired only for certain reasons and only upon the recommendation of the superintendent, after which the career employee may request a hearing before the board of education. See N.C. Gen. Stat. § 115C-325(e)(1), (h).

In the spring of 2012, McMillan was an In-School Suspension Coordinator at Reid-Ross Classical Middle-High School. Hatch Dep. [D.E. 46-4] 29–30; McMillan Dep.[D.E. 46-2] 19. In April 2012, McMillan allowed a student ("Student A") to move in with her so that Student A could avoid a "bad situation at home." McMillan Dep. 24–25.

On April 25, 2012, another student ("Student B") told his teacher, Samantha Brown ("Brown"), that Student A had stashed drugs in a school bathroom. McMillan Dep. 33–34; Defs.' Stmt. Material Facts ¶¶ 5–7; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 5–7. Brown contacted McMillan. See McMillan Dep. 33; Defs.' Stmt. Material Facts ¶ 8; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 8. McMillan spoke with Brown and Student B. McMillan Dep. 33–34; Defs.' Stmt. Material Facts ¶ 8; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 8. Student B suggested that he could retrieve the

drugs. McMillan Dep. 33. McMillan and Brown agreed to let Student B retrieve the drugs, and Student B did so. Id. 33–34. After Student B retrieved the drugs, he met with McMillan. Id. 34. They "stepped out of view of [a security] camera . . . and [Student B] reached in his pocket and pulled out the medication." Id. McMillan recognized the drugs as anti-nausea medication that a doctor had prescribed to her late daughter. Id. McMillan took the bottle from Student B. Id. McMillan walked to Assistant Principal Laquisha Leath's office, but Assistant Principal Leath was not there. Id. McMillan asked a custodian to check the bathroom for any other contraband. Id. 35. Later that day, McMillan spoke with Assistant Principal Leath about the incident. Id.

On the morning of April 26, 2012, Student B's mother came to the school and complained to Principal Thomas Hatch ("Hatch") about the events of April 25, 2012. Hatch Dep. 49–50. Hatch spoke with Student B, who said that McMillan had instructed Student B to retrieve the drugs. Id. 52–57. Later that day, Hatch spoke with McMillan about the events of April 25, 2012. Id. 60–61; see McMillan Dep. 47–48. Hatch told McMillan that her actions on April 25, 2012, had "jeopardiz[ed her] job and this incident could cost [McMillan her] job." McMillan Dep. 48. Hatch instructed McMillan to send him a "statement" describing her version of the events of April 25, 2012. Id.; Hatch Dep. 62.

McMillan emailed Hatch a statement, in which she said she had informed Assistant Principal Leath ("Leath") of the drug incident on April 25, 2012. See McMillan Statement [D.E. 48]. Hatch also received a statement from Leath, in which Leath stated that McMillan had not mentioned to her Student B, the drugs, or any other part of the bathroom incident. See [D.E. 46-4] 137–38. Hatch continued his investigation and collected statements from Brown, Student A, Student B, another student, a janitor, and another faculty member. Hatch Dep. 127–128, 131. Hatch provided the information he had collected to Locklear, the Associate Superintendent for Human Resources. 2d

4

Am. Compl. ¶ 3; Ans. ¶ 3. After reviewing the information, Locklear presented the information to Superintendent Dr. Frank Till ("Till") and told Till that McMillan might not have been fully truthful about the events of April 25, 2012. Till Dep. 22–23.

Till decided to suspend McMillan with pay and to schedule an administrative conference to discuss the matter. On May 21, 2012, Till sent McMillan a letter notifying her of this action and setting the date of the administrative conference for May 22, 2012. See Till Letter [D.E. 46-7]. The letter also said that Till had "received certain information which may affect [McMillan's] employment as a teacher" and that "cause may exist for [her] dismissal." Id. The letter referenced N.C. Gen. Stat. § 115C-325, a statute which outlined the procedures required before firing a school employee with career status, but mistakenly referenced a nonexistent subsection of that statute. See id. McMillan understood that the purpose of the administrative conference "was to discuss whether or not the grounds existed for [her] termination" and understood that "there was a possibility [her] employment could be terminated." McMillan Dep. 66. McMillan knew that she had certain rights as a career employee, but did not know specifically what those rights were. Id. 66–67.

On May 22, 2012, the administrative conference occurred with McMillan, Till, and Locklear present. Id. 64. The administrative conference lasted approximately one hour. Id. 65. Till asked McMillan "to give an account of what had happened on" April 25 and 26, 2012, "and [McMillan] proceeded to tell the story." Id. 64. Till related what he understood to be the sequence of events, and McMillan explained why she believed Till's understanding was incorrect. Id. 64–65. At the end of the meeting, Till told McMillan that he would consider the matter, and McMillan understood that Till would be deciding "whether what [McMillan] said was the truth" or whether the statements of other witnesses were the truth. Id. 66. McMillan also understood that "Till was considering whether or not grounds existed for terminating [McMillan's] employment." Id.

On May 25, 2012, Locklear's assistant called McMillan to set up a meeting with Locklear, which took place later that day. Id. 78–79. At the meeting, Locklear told McMillan that "Till's decision is dismissal." Id. 81. McMillan asked "about letters of recommendation," and Locklear "assured [McMillan] that [Locklear] thought Mr. Hatch would be glad to give [her] a good recommendation." Id. Locklear then told McMillan that "in lieu of being dismissed [she] could resign" and showed McMillan a pre-filled "Tender of Resignation" form, dated May 25, 2012. Id. 82; see Tender of Resignation [D.E. 56-1]. The form listed information about the employee and contained numerous check-boxes to describe the "reason for separation." See Tender of Resignation. The form stated that only one of the "reason for separation" boxes be checked. See id. Although McMillan stated that no boxes were checked when she signed the form, the version of the form in the CCBE file shows that a box was checked for "Resigned – Other Reason(s)." Compare McMillan Dep. 81–82, with Tender of Resignation. The "Resigned – Other Reasons" category has a blank line next to it that could be used to describe the category in more detail, but no additional reasons were given. See Tender of Resignation. McMillan signed the resignation form. See McMillan Dep. 82.

B.

On May 27, 2014, McMillan filed suit against Cumberland County Schools in Cumberland County Superior Court. See [D.E. 1-1] 9–21. On June 13, 2014, Cumberland County Schools removed the action to this court [D.E. 1]. On July 11, 2014, McMillan amended her complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1), dropping Cumberland County Schools as a defendant and naming the Cumberland County Board of Education and Dr. Joseph M. Locklear as defendants [D.E. 8].

On September 26, 2014, this court entered a scheduling order, requiring that "motions . . . to amend pleadings . . . be made promptly after the information giving rise to the motion becomes

6

known to the party or counsel. Any such motion filed after January 16, 201[5], must meet the standards of Fed. R. Civ. P. 15 and 16." See Scheduling Order [D.E. 21] 2.[2] On November 4, 2014, McMillan moved for leave to file a second amended complaint [D.E. 24], which the court granted on December 30, 2014 [D.E. 28]. On January 9, 2015, McMillan filed her second amended complaint [D.E. 29].

On August 28, 2015, the court extended certain deadlines in the scheduling order. See [D.E. 41]. By August 28, 2015, however, the deadline to file an amended complaint already had passed. See Scheduling Order 2. On December 15, 2015, McMillan moved for leave to file a third amended complaint [D.E. 42] and filed a memorandum in support [D.E. 43]. Defendants filed a memorandum in opposition [D.E. 49], to which McMillan replied [D.E. 50].

II.

As for McMillan's motion for leave to file a third amended complaint, a party generally may amend its complaint once as a matter of course. Fed. R. Civ. P. 15(a)(1). Further amendments are allowed "only with the opposing party's written consent or the court's leave," although "[t]he court should freely give leave when justice so requires." Id. 15(a)(2). Once a district court has issued a scheduling order, however, the scheduling order "may be modified only for good cause." Id. 16(b)(4).

_____

[2] Due to a typographical error, the order states "January 16, 2014," a date before the order was issued, as the deadline for motions to amend pleadings. See Scheduling Order 2. McMillan argues that the correct date "could only have been some time in January of 2016, the first January to occur after the end of discovery." Pl.'s Mem. Supp. Mot. to File Third Am. Compl. [D.E. 43] 7. McMillan's reading would allow a party to amend its complaint after the deadlines for completing discovery and filing dispositive motions had passed. See Scheduling Order 1. Such an interpretation is unreasonable and would necessitate a second round of discovery when a party added a claim or defense months after discovery closed. The only reasonable interpretation of the scheduling order was that it referred to January 16, 2015, the only January after the order was issued but before discovery closed.

"[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008); see Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *8 (E.D.N.C. Sept. 28, 2011) (unpublished); Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc., No. 5:06-CV-160-D, 2011 WL 1262159, at *1–2 (E.D.N.C. Mar. 21, 2011) (unpublished). "If the party fails to establish 'good cause' under Rule 16, a trial court may deny the motion to amend and need not conduct the inquiry under Rule 15." Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8. Federal Rule of Civil Procedure 16's "good cause" standard turns on "the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." Montgomery v. Anne Arundel Cty., 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam) (unpublished); see Nourison Rug Corp., 535 F.3d at 298; Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8; Farrar & Farrar Dairy, Inc., 2011 WL 1262159, at *2. Establishing good cause requires the moving party to show that the party could not reasonably have met the deadline despite the party's diligence. See, e.g., Cook v. Howard, 484 F. App'x 805, 815 (4th Cir. 2012) (per curiam) (unpublished); United States v. Godwin, 247 F.R.D. 503, 506 (E.D.N.C. 2007).

McMillan does not attempt to meet Rule 16's good cause standard. Indeed, she acknowledges that her "amendment is based on the same general allegations that form the basis of the claims she asserted in her previous complaints." Pl.'s Mem. Supp. Mot. to File Third Am. Compl. 10 (quotation omitted). Specifically, McMillan's amended complaint seeks to add a breach of contract claim against the CCBE, asserting that her employment contract incorporated N.C. Gen. Stat. § 115C-325. See id. 9–11.

With ordinary diligence, McMillan could have discovered and sought to add a breach of

8

contract claim before January 16, 2015. Indeed, the CCBE's alleged breach of its employment contract with McMillan is an element of the tortious-interference claim in McMillan's second amended complaint. Accordingly, McMillan has failed to show good cause. See, e.g., Nourison Rug Corp., 535 F.3d at 298; Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8. Thus, the court denies McMillan's motion to file a third amended complaint.

III.

As for defendants' motion for summary judgment, summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248.

In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at

9

587–88. However, a genuine issue of material fact "is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); see Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011); Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990).

Additionally, this case requires the court to apply North Carolina law. In resolving any disputed issue of state law, the court must determine how the Supreme Court of North Carolina would rule on plaintiff's claims. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). If the state supreme court "has spoken neither directly nor indirectly on the particular issue before [the federal court, that court must] . . . predict how [the state supreme] court would rule if presented with the issue." Id. (quotations omitted). In making that prediction, the court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Id. (quotation omitted).[3] When predicting an outcome under state law, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

## A.

In her first claim, McMillan alleges that her termination violated her procedural due process rights under the Fourteenth Amendment and seeks relief from the CCBE and Locklear under 42 U.S.C. § 1983. To show a violation of due process rights, "a plaintiff must first show that [s]he

---

[3] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

ha[d] a constitutionally protected liberty or property interest, and that [s]he ha[d] been deprived of that protected interest by some form of state action." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (citation and quotations omitted); see Roberson v. City of Goldsboro, 564 F. Supp. 2d 526, 529–31 (E.D.N.C. 2008); Whitesell v. Town of Morrisville, 446 F. Supp. 2d 419, 423–24 (E.D.N.C. 2006).

Public employees have a constitutionally protected property interest in continued employment if state law creates such a property interest. See, e.g., Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538–39 (1985); Stone, 855 F.2d at 172–73. However, an employee who resigns voluntarily, even if "prompted to do so by events set in motion by [her] employer[,] . . . relinquish[es] [her] property interest voluntarily" and therefore cannot show that state action caused deprivation of a property interest. Stone, 855 F.2d at 173. When a state employee with a constitutionally protected property interest resigns, she has recourse in section 1983 only if she can show that her "'resignation' was so involuntary that it amounted to a constructive discharge." Id. A resignation can be the result of a constructive discharge when the employee resigned as a result of "the employer's misrepresentation or deception" or when the employee was "forced [to resign] by the employer's duress or coercion." Id. at 174.

When an employee holds a property interest in continued employment, the Due Process Clause prohibits terminating the employee's employment without meeting certain minimum procedural standards. The procedural safeguards provide "an initial check against mistaken decisions," but need not "definitively resolve the propriety of the discharge." Cleveland Bd. of Educ., 470 U.S. at 545–46. Specifically, "the employee facing termination 'is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story.'" Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1463 (4th

11

Cir. 1990) (quoting Cleveland Bd. of Educ., 470 U.S. at 546). The procedures "need not be elaborate," and requiring a governmental employer to give an employee more than oral or written notice, an explanation of evidence, and an opportunity to persuade the decisionmaker "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Cleveland Bd. of Educ., 470 U.S. at 545–46. Notice means "notice of the proposed deprivation," such as termination of employment. See Gray v. Laws, 51 F.3d 426, 438 (4th Cir. 1995). The explanation of the employer's evidence requirement is not exacting and requires only "such descriptive explanation be afforded as to permit [the employee] to identify the conduct giving rise to the [potential] dismissal and thereby to enable [her] to make a response." Linton v. Frederick Cty. Bd. of Cty. Comm'rs, 964 F.2d 1436, 1440 (4th Cir. 1992). Moreover, the Due Process Clause does not require the government to "provide the employee with internal employer documents for which the employee has not asked." Riccio, 907 F.2d at 1464.

The court need not address whether McMillan voluntarily resigned. Cf. Stone, 855 F.2d at 175–78. Even viewing the evidence in the light most favorable to McMillan, no reasonable jury could find that the CCBE or Locklear violated her due process rights. Here, McMillan had notice, an explanation of her employer's evidence, and an opportunity to persuade the decisionmaker. See, e.g., Cleveland Bd. of Educ., 470 U.S. at 546; Gray, 51 F.3d at 438–39; Riccio, 907 F.2d at 1463–64. Specifically, on April 26, 2012, almost a month before McMillan resigned, Principal Hatch told McMillan that a parent had complained about McMillan's conduct concerning drugs in the bathroom on April 25, 2012, and that "this incident could cost [McMillan her] job." See McMillan Dep. 47–48. Principal Hatch then instructed McMillan to "e-mail him a statement of what had occurred." Id. 48. On May 21, 2012, Till wrote McMillan, told her that "cause may exist for [her] dismissal," suspended her with pay, and scheduled an "administrative conference" for May 22, 2012, to discuss

12

the events of April 25 and 26, 2012. See Till Letter. McMillan was "aware, after reading [Till's letter], that there was a possibility [her] employment could be terminated." McMillan Dep. 66. McMillan does not argue, and the record does not suggest, that she misunderstood this letter or did not know to what events it referred. On May 22, 2012, at the administrative conference, McMillan, Till, and Locklear discussed the events of April 25 and 26, 2012. Id. 64–65. In this conference, McMillan gave her side of the story, Till stated what he understood to be the sequence of events, and McMillan responded to correct issues about which she believed Till was incorrect. Id. 64. On May 22, 2012, McMillan understood "that Till was considering whether or not grounds existed for terminating [her] employment." Id. 66. McMillan also understood that Till was weighing her credibility against the credibility of other sources who gave contradictory accounts of the events of April 25 and 26, 2012. Id.

McMillan argues that she did not receive sufficient notice under the Due Process Clause because defendants never explicitly told her "what the charges were against her, what she supposedly had done wrong, why she was suspended, what evidence existed regarding any (unspecified) wrongdoing, or what any witnesses said that in any way implicated her or was inconsistent with anything she had described to Till and Locklear." Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. [D.E. 51] 4. The Due Process Clause, however, merely requires oral or written notice of the alleged wrongdoing and the possible consequences and an opportunity to be heard. See, e.g., Cleveland Bd. of Educ., 470 U.S. at 545–46; Gray, 51 F.3d at 438–39; Riccio, 907 F.2d at 1463–64. Even viewing the evidence in the light most favorable to McMillan, McMillan's employer informed her that she had been involved in an incident with Student B and drugs at the school on April 25, 2012, that this incident and its aftermath put her job in jeopardy, that she had been suspended with pay on the basis of information that might provide cause for her termination, that Till had received contradictory

evidence regarding the incident, and that Till was deciding whether to recommend termination. Under these circumstances, McMillan received sufficient notice.

McMillan also received a sufficient opportunity to persuade Till, who would decide whether to recommend dismissal to the CCBE. At the administrative conference, McMillan recounted her version of the events of April 25 and 26, 2012, heard how Till understood the events, and had the opportunity to correct Till where she felt Till had misunderstood what had happened. McMillan understood that Till would be deciding whether to credit her statements or the statements of others. Accordingly, the administrative conference provided a sufficient opportunity to persuade Till.

Finally, McMillan understood the evidence against her and was able to formulate her response. Even if Till and Locklear did not tell McMillan exactly what evidence they had received from other sources, McMillan was able "to identify the conduct giving rise to the [possible] dismissal and . . . make a response." Linton, 964 F.2d at 1440. McMillan's conduct at the meeting on May 22, 2012, made clear that she knew that her conduct on April 25 and 26, 2012, was the conduct at issue. See McMillan Dep. 64–65. Furthermore, McMillan responded and gave her side of the story, including correcting what she believed to be Till's incorrect view of the evidence. Id. Although defendants did not provide McMillan with specific statements from other witnesses made in the course of Hatch's investigation, McMillan never asked for those statements or any other evidence. The Due Process Clause did not "obligate the [CCBE] to provide [McMillan] with internal employer documents for which the employee has not asked." Riccio, 907 F.2d at 1464. Accordingly, the court grants summary judgment to defendants on McMillan's section 1983 claim. See, e.g., Gray, 51 F.3d at 538–39.

### B.

McMillan claims that defendants negligently induced her to resign and that Locklear

fraudulently induced her to resign. See 2d Am. Compl. ¶¶ 58–76. In North Carolina, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." Smith v. Hefner, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952); Farrell v. Transylvania Cty. Bd. of Educ., 175 N.C. App. 689, 696, 625 S.E.2d 128, 134 (2006) (quotation omitted). "[A]n official may not be held liable unless it be alleged and proved that his act, or failure to act, was corrupt or malicious . . . or that he acted outside and beyond the scope of his duties." Smith, 235 N.C. at 7, 68 S.E.2d at 787; Farrell, 175 N.C. App. at 696, 625 S.E.2d at 134 (quotation omitted); Schlossberg v. Goins, 141 N.C. App. 436, 446, 540 S.E.2d 49, 56 (2000).

A public officer will not lose public-official immunity if the officer's judgment is misguided, so long as the public officer acted without malice or corruption. See, e.g., Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id. at 313, 321 S.E.2d at 890. "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 313, 321 S.E.2d at 890–91; see Miller v. Jones, 224 N.C. 783, 787, 32 S.E.2d 594, 597 (1945) ("The [corrupt or malicious] act or omission . . . takes on the guise of a malicious tort."). Furthermore, North Carolina law presumes that public officials act in good faith. See, e.g., In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981); Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961). A party may overcome that presumption of good faith only with "competent and substantial evidence." Leete v. Cty. of Warren, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995); see Huntley, 255 N.C. at 628, 122 S.E.2d at 686–87.

North Carolina courts determine whether a person is an official for the purpose of public-

official immunity based on the source of his authority and on the use of discretion in carrying out his duties. See Farrell, 175 N.C. App. at 695–96, 625 S.E.2d at 133. A public official is someone whose position was "created by the constitution or statutes of the sovereignty" or by a delegation of such authority. State v. Hord, 264 N.C. 149, 155, 141 S.E.2d 241, 245 (1965); Farrell, 175 N.C. App. at 695, 625 S.E.2d at 133 (quotation omitted). Public officials "exercise a certain amount of discretion, while employees perform ministerial duties." Farrell, 175 N.C. App. at 695, 625 S.E.2d at 133 (quotation omitted); Cherry v. Harris, 110 N.C. App. 478, 480, 429 S.E.2d 771, 773 (1993) (quotation omitted). "School administrators" are public officers if their jobs involve "discretionary acts involving personal deliberation, decision, and judgment." Farrell, 175 N.C. App. at 696, 625 S.E.2d at 134.

Locklear was the CCBE's Associate Superintendent for Human Resources. See 2d Am. Compl ¶ 3; Ans. ¶ 3; Till Dep. 12–13; see N.C. Gen. Stat. § 115C-278 (creating the position). The position required Locklear to make discretionary decisions, including "when a personnel matter needed to be brought to the attention of" Till, Defs.' Stmt. Material Facts ¶¶ 27–28; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 27–28, and whether to discuss with an employee the employee's ability to resign or face possible termination. See Till Dep. 56–58, 179. These decisions involved "deliberation, decision, and judgment." Farrell, 175 N.C. App. at 696, 625 S.E.2d at 133. Therefore, Locklear, when acting as the Associate Superintendent for Human Resources in this case, was entitled to public-official immunity for alleged negligent acts taken in the course of his official duties.

In opposition, McMillan argues that Locklear is not protected by public-official immunity based on McMillan's allegations "that Locklear acted maliciously, corruptly, and/or beyond the scope of his official duties." Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 26–27. But even viewing the

16

evidence in the light most favorable to McMillan, no rational jury could find that Locklear acted corruptly, maliciously, or beyond the scope of his official duties. At summary judgment, "a party opposing a properly supported motion . . . may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. This principle applies with particular force when considering whether a public official acted corruptly, maliciously, or beyond the scope of his official duties. See, e.g., Petersen v. Midgett, 140 F. Supp. 3d 490, 504–07 (E.D.N.C. 2015); Perry v. Pamlico Cty., 88 F. Supp. 3d 518, 531–34 (E.D.N.C. 2015). Indeed, mere conclusory allegations of such mental states without specific facts are not sufficient even to survive a motion to dismiss. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Green v. Kearney, 203 N.C. App. 260, 273–74, 690 S.E.2d 755, 765 (2010). Here, public-official immunity bars McMillan's negligence claims against Locklear.

McMillan also claims that defendants made negligent misrepresentations to her at the May 25, 2012 meeting, that Locklear made fraudulent misrepresentations to her at that meeting, and that those misrepresentations induced her to resign.[4] In North Carolina, to state a fraud clam, a plaintiff

---

[4] McMillan argues that she also has made a claim that defendants negligently conducted the investigation leading to her alleged termination and that defendants have not moved for summary judgment as to her alleged negligent-investigation claim. See Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 28; Pl.'s Am. Surreply Opp'n Defs.' Mot. Summ. J. [D.E. 58] 5–6. In McMillan's second amended complaint, she does allege that defendants "owed Plaintiff a duty to act reasonably in investigating the allegations against her," 2d Am. Compl. ¶ 70, but she does not plead that defendants breached that duty. See id. ¶¶ 71–76.

McMillan did not properly plead a negligent-investigation claim. Moreover, McMillan cannot use her memorandum in opposition to defendants' motion for summary judgment to amend her complaint. See, e.g., Hexion Specialty Chems. Inc., 2011 WL 4527382, at *7–10 (collecting cases holding that a party cannot use briefing in support of or opposition to summary judgment to amend its complaint). Thus, her alleged negligent-investigation claim fails. Alternatively, even if McMillan properly pleaded a negligent-investigation claim, defendants would be entitled to summary judgment. See, e.g., Medlin v. Bass, 327 N.C. 587, 590–92, 398 S.E.2d 460, 461–63 (1990); Inman v. City of Whiteville, 236 N.C. App. 301, 305–08, 763 S.E.2d 332, 335–37 (2014).

must plausibly allege "(1) [a] [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party," where "any reliance on the allegedly false representations [is] reasonable." Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); see Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658–59 (1992). To state a negligent-misrepresentation claim, a plaintiff must plausibly allege that (1) he justifiably relied; (2) to his detriment; (3) on information "prepared without reasonable care"; (4) by "one who owed the relying party a duty of care." Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988); see Brinkman v. Barrett Kays & Assocs., P.A., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43–44 (2003).

The "question of justifiable reliance [for negligent-misrepresentation claims] is analogous to that of reasonable reliance in fraud actions." Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999) (quotation omitted). "The tort of negligent misrepresentation occurs when a party justifiably relies to [her] detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Raritan River Steel Co., 322 N.C. at 206, 367 S.E.2d at 612. Reasonable reliance also is required to show fraudulent misrepresentation. Johnson v. Owens, 263 N.C. 754, 756, 140 S.E.2d 311, 313 (1965); Flanary v. Wilkerson, 217 N.C. App. 195, 719 S.E.2d 255 (2011) (unpublished table decision).

"A party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement." Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014); see Flanary, 217 N.C. App. at 195, 719 S.E.2d at 255. Reliance is not reasonable if a plaintiff has an opportunity to investigate the truth of a statement but fails to do so. See Dallaire, 367 N.C. at 369–70, 760 S.E.2d at 267–68; see also Flanary, 217 N.C.

App. at 195, 719 S.E.2d at 255. "[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that [s]he was denied the opportunity to investigate or that [s]he could not have learned the true facts by exercise of reasonable diligence." Oberlin Capital, L.P. v. Slavin, 147 N.C. App. 52, 59, 554 S.E.2d 840, 846 (2001) (quotation omitted); Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999).

McMillan claims that Locklear negligently and fraudulently misrepresented that Till had decided to fire her and that her employment would be terminated immediately if she did not sign the Tender of Resignation form and resign. Till, however, could only recommend termination to the CCBE, and the CCBE could not have fired McMillan without affording her the procedural protections provided by N.C. Gen. Stat. § 115C-325. That statute was incorporated into McMillan's employment contract. See Defs.' Stmt. Material Facts ¶ 2; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 2. Till's letter to McMillan referenced that statute's protections, and McMillan knew that she had certain rights as a career-status employee. See Till Letter; McMillan Dep. 66–67. Still, McMillan made no effort to learn what those rights were after receiving Till's letter, either on her own or through the assistance of anyone else. See McMillan Dep. 66–67. At the meeting on May 22, 2012, which McMillan understood was held to determine whether grounds existed for her termination, McMillan did not ask Till or Locklear any questions about her rights as a career-status employee. Id. 90–91. Although Locklear handed McMillan a resignation form on May 25, 2012, dated the same day as the meeting, McMillan did not ask for more time to consider her options. Id. 84. McMillan testified that she "felt pressured," but she mentions no facts other than the date on the form and it being completed that caused her to feel that she had to sign the form on that date. See id. Even if the date on the form was itself a "deadline," McMillan does not argue, and the record does not

19

suggest, that she could not have taken time on that day to ask questions or to investigate her rights. Moreover, McMillan had ample opportunity to investigate her rights as a career-status employee in the days following her suspension leading up to May 25, 2012. See id. 85. Even viewing the evidence in the light most favorable to McMillan, no reasonable jury could find reasonable reliance on Locklear's alleged misstatement. See, e.g., Stone, 855 F.2d at 176–77. Accordingly, McMillan's claims of negligent misstatement by the CCBE and of fraudulent misstatement by Locklear both fail. Thus, the court grants defendants' motion for summary judgment on McMillan's claims of negligent and fraudulent misrepresentation.

C.

Finally, McMillan claims that Locklear tortiously interfered with the employment contract between McMillan and the CCBE by inducing her to resign. See 2d Am. Compl. ¶¶ 47–57. To prove tortious interference with contract under North Carolina law, a plaintiff must show "(1) a valid contract between the plaintiff and a third person . . . ; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Parties who may interfere in contractual relations generally fall into two categories: outsiders to the contract and non-outsiders. An "outsider" is not party to the contract and has "no legitimate business interest of [his or her] own in the subject matter thereof." Smith v. Ford Motor Co., 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). Conversely, any party that "had a legitimate business interest . . . in the subject matter" of the contract is a "non-outsider." Id. at 87, 221 S.E.2d at 292. For example, non-outsiders to a contract include employees of an organization with whom the plaintiff has contracted. See, e.g., Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498–500, 411 S.E.2d 916, 924–25 (1992);

20

Kingsdown, Inc. v. Hinshaw, No. 14 CVS 1701, 2015 WL 1441826, at *15 (N.C. Super. Ct. Mar. 25, 2015) (unpublished); Stec v. Fuzion Inv. Capital, LLC, No. 11 CVS 4241, 2012 WL 1524487, at *8 (N.C. Super. Ct. Apr. 30, 2012) (unpublished). Generally, acts of non-outsiders, such as officers of the employing organization, "are presumed to have been done in the interest of the corporation" and are therefore "justified." Embree Constr. Grp., Inc., 330 N.C. at 498–99, 411 S.E.2d at 924–25 (quotation omitted); Wilson v. McClenny, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964); Privette v. Univ. of N.C. at Chapel Hill, 96 N.C. App. 124, 134–35, 385 S.E.2d 185, 191 (1989).

A plaintiff can overcome the presumption that a non-outsider's action was justified by showing that the non-outsider took the action for an improper reason. Embree Constr. Grp., Inc., 330 N.C. at 498, 411 S.E.2d at 924; Stec, 2012 WL 1524487, at *8. To do so, a plaintiff must show that the defendant acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." Sellers v. Morton, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008) (quotation omitted); Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999) (quotation omitted). Merely alleging an improper actual or primary motive, however, will not suffice. Instead, the facts "must admit of no motive for interference other than malice." Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007); Filmar Racing, Inc. v. Stewart, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001); Privette, 96 N.C. App. at 134–35, 385 S.E.2d at 190–91.

As the CCBE's Associate Superintendent for Human Resources, Locklear had a "legitimate business interest" in McMillan's contract and her decision whether to resign, and was therefore a "non-outsider" to McMillan's contract. See Smith, 289 N.C. at 87, 221 S.E.2d at 292. Even viewing the evidence in the light most favorable to McMillan, no rational jury could find that Locklear acted

21

with malice or for an illegitimate reason. See, e.g., Sellers, 191 N.C. App. at 82, 661 S.E.2d at 921. Thus, the court grants defendants' motion for summary judgment on McMillan's claim of tortious interference with contract.

IV.

In sum, plaintiff's motion for leave to file a third amended complaint [D.E. 42] is DENIED and defendants' motion for summary judgment [D.E. 45] is GRANTED. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This **2 9** day of September 2016.

JAMES C. DEVER III
Chief United States District Judge